1
2
3
4
5
6

Adam H. Braun, Esq.  [CASBN 199544]
BRAUN & BRAUN LLP
10250 Constellation Boulevard, Suite 1020
Los Angeles, California 90067
Telephone:  (310) 277-4777
Facsimile:   (310) 507-0232
Email:  adam@braunlaw.com


Attorneys for Defendant Si Chen

7
8
9
10

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

11
12
13
14
15
16

| UNITED STATES OF AMERICA, | Case No. SA CR 17-254-CJC |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | Date:   October 1, 2018 |
| SI CHEN, | Time:   11:00 a.m. |
| Defendant. | Place:  Courtroom of the Honorable Cormac J. Carney United States District Judge |

17
18
19
20
21
22
23
24
25
26
27
28

Defendant Si Chen, by and through her counsel of record, Adam H. Braun, Esq., hereby submits her Sentencing Memorandum.

In short, Ms. Chen was asked by an individual named Maggie in China (who was a customer of Ms. Chen's former employer) to help ship various products to China, some of which - but certainly not all of which - were subject to export control.  For that, Ms. Chen has pled guilty to conspiracy to commit export control violations and two related counts.

Ms. Chen has been in custody for nearly 18 months, has not seen her six-year-old U.S. citizen daughter during this detention, will be deported to China at the conclusion of her case, and will be permanently separated from her daughter.  In point of fact, her husband has made clear that he will remain in the U.S. with their daughter when Ms. Chen is deported.  To compound matters (and likely related to her grim fate), Ms. Chen has

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

1  suffered from (and been diagnosed with) severe depression during her custody and was

2  hospitalized for several weeks and placed on suicide watch following her attempt to

3  commit suicide by repeatedly banging her head into a wall at MDC.  She has lost

4  everything as a result of this episode.

5      In sum, there is no need to impose further incarceration beyond the nearly 18

6  months Ms. Chen has served, and doing so in light of the terrible consequences she has

7  already suffered would seem unnecessarily cruel.

8                                                    Respectfully Submitted,

9

10  Dated:    September 17, 2018                    BRAUN & BRAUN LLP

11                                                By:   /s/ Adam H. Braun

12                                                     Adam H. Braun

13                                                     Counsel for Defendant
                                                       SI CHEN

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND .............................................................................................. 2

    A.  Manipulation by "Maggie" ..................................................................... 2

       1.      Maggie Deceives Ms. Chen About Employees "Frances" and "Julia" ............... 3

       2.      Maggie Deceives Ms. Chen About Reasons for Shipment Destination and Legality of Shipments ................................................................ 4

       3.      Maggie Misleads Chen that She Was Trying to Take Advantage of Preferential Prices for U.S. Customers ........................................................ 6

       4.      Many of the Products that ASSI Sought Were Available in China ..................... 7

       5.      Helping Maggie Avoid Higher Import Taxes and Duties ................................... 8

       6.      Listing the Actual Name of Parts ...................................................................... 9

    B.  Ms. Chen's Loss of Her Family and Severe Emotional Hardship ........................ 9

III.    SENTENCING GUIDELINE ANALYSIS AND RELATED DISCUSSION ........ 10

    A.  Guidelines Calculations ......................................................................... 10

    B.  Grouping Analysis ................................................................................. 11

    C.  Effect of Grouping ................................................................................ 12

    D.  Two-Level Sentencing Enhancement for Money Laundering Should Not Be Applied At Least for Equitable Reasons Under Section 3553 ........................... 13

    E.  §3553 Variance is Appropriate to Provide Proportionate Punishment and to Reflect the Depth that Ms. Chen Has Suffered in Her 18 Months of Custody and Will Suffer with Her Deportation .................................................... 14

    F.  No Fine Is Necessary ............................................................................. 17

IV.     CONCLUSION ............................................................................................. 18

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

DEFENDANT CHEN'S SENTENCING MEMORANDUM

1
2

# TABLE OF AUTHORITIES

3 **Statutes**

4 15 C.F.R. § 742.4 ................................................................................................ 11

5 15 C.F.R. § 742.6 ................................................................................................ 11

6 15 C.F.R. § 758.1 ................................................................................................ 11

7 15 C.F.R. § 764.2 ................................................................................................ 11

8 18 U.S.C. § 1543 ................................................................................................ 12

9 18 U.S.C § 1705(a), (c) ....................................................................................... 11

10 18 U.S.C. § 1956(a)(2)(A) ................................................................................. 11

11 18 U.S.C. § 3553 ................................................................................... 12, 14, 17

12 U.S.S.G. § 3D1.2 ........................................................................................... 11, 12

13 U.S.S.G. § 3D1.3 ................................................................................................ 12

14 U.S.S.G. § 3D1.4 .......................................................................................... 10, 12

15 U.S.S.G. § 3E1.1 ................................................................................................ 10

16 U.S.S.G. § 2L2.2 .......................................................................................... 10, 12

17 U.S.S.G. § 2M5.1(a)(1) ............................................................................... 10, 13

18 U.S.S.G. § 2S1.1 ......................................................................................... 10, 12

19 U.S.S.G. § 3B1.2 ................................................................................................ 10

20
21
22
23
24
25
26
27
28

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

ii.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant Si Chen ("Ms. Chen") is a Chinese citizen who came to the United States on a student visa for graduate studies in accounting.  She became a CPA and eventually a mother to her young daughter who is a U.S. citizen.  Her daughter is now six years old. While trying to build a professional life and network in the United States, Ms. Chen was manipulated by an individual named "Maggie" who had been a Chinese customer of Ms. Chen's former employer and reached out to Ms. Chen seeking assistance with shipping products from the U.S. to China.  As a new immigrant needing to build a business and professional network for herself in a new country, Ms. Chen was vulnerable to being used by someone like Maggie.

As discussed in greater detail below, the discovery in this case confirms that Maggie repeatedly lied to Ms. Chen in varied ways that are inconsistent with Ms. Chen having full knowledge of Maggie's true intentions from the outset and are consistent with Maggie withholding from Ms. Chen, until the later stages, the full scope of Maggie's schemes.  In short, Chen initially believed Maggie and her fictitious employees were cheating in more conventional ways, such as attempting to evade Chinese import duties (by under-declaring the value of shipments) and trying to take advantage of preferential prices offered by U.S. suppliers to domestic purchasers (as opposed to foreign purchasers). That activity would have been illegal, although it is somewhat common among Chinese businesses and recent Chinese immigrants and is often misunderstood by them as just part of the games Chinese businesses play.  As a result, Ms. Chen knew from the beginning that she was helping Maggie do something illegal, even if she only learned much later on that the shipments were illegal because they were subject to export controls.  Thus, Chen was concerned from the beginning, for reasons independent of export controls, about having her true name associated with the office Maggie directed her to lease for the shipments.

The discovery also confirms Ms. Chen had no technical knowledge about, or engineering perspective on, the underlying products.  Instead, the e-mails in the case

1.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

confirm all technical questions asked of suppliers were drafted by Maggie (sometimes using one of her aliases such as "Francis"), forwarded to Ms. Chen, and then Ms. Chen would copy and paste Maggie's text into an email to a supplier.[1]

Furthermore, as context about Maggie's requests, a number of the shipments that Ms. Chen arranged for Maggie were not, in fact, covered by export controls, which is why many of the shipments could not be charged in this case.

However, several of the shipments were subject to export controls, and Ms. Chen eventually learned that Maggie had been lying to her. Regrettably, she failed to do the right thing by refusing any further help no matter how awkward or how far along things had gone by that point.

For her conduct, Defendant Si Chen pled guilty to conspiracy to ship products to Maggie that were subject to export controls, promotional money laundering for receiving bank transfers from Maggie to pay for these shipments, and use of a false passport when leasing the Los Angeles area office Maggie requested her to rent for the shipments.

Ms. Chen has been in custody at Metropolitan Detention Center ("MDC") since May 23, 2017, has not seen her young daughter even once during her detention, and has been effectively abandoned by her husband who intends to remain in the United States on his work visa and keep their daughter in the U.S. even after Ms. Chen is deported to China.

As discussed in greater detail below, Ms. Chen has been under severe psychiatric distress during her detention and in recent months was hospitalized and placed on suicide watch. Exacerbating her emotional stress, Ms. Chen's father in China has also suffered a brain hemorrhage during the period of Ms. Chen's custody.

## II.    BACKGROUND

### A.    Manipulation by "Maggie"

Ms. Chen initially believed that she was helping Maggie with something more mundane which was avoiding or minimizing import duties in China and taking advantage

---

[1] Exhibits 1, 2, and 3 are examples of "Frances"/Maggie emailing Chen and instructing her to copy the text from Maggie's emails for any technical questions or answers sent to a supplier's representatives, in this case a representative named Dr. Shevy. In fact, Exhibit 4 is an email from Chen to "Frances" in which Chen admits that: "His [Dr. Shevy's] words are too professional to me in order to (sic.) this is not my field."

DEFENDANT CHEN'S SENTENCING MEMORANDUM

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

of the fact that many U.S. suppliers offered lower or preferential prices to U.S. purchasers (and thus, that Maggie needed to conceal from the supplier that the ultimate destination was overseas).

Ms. Chen was not highly compensated by Maggie (receiving only a few hundred dollars per shipment), which again is consistent with Ms. Chen not understanding the seriousness of what Maggie was having her to do.[2]

In fact, Ms. Chen was repeatedly misled and deceived by Maggie when she reached out to Ms. Chen for assistance with shipping products to China.

The discovery in this case confirms that Maggie repeatedly lied to Ms. Chen in varied ways that are inconsistent with Ms. Chen having full knowledge from the outset of Maggie's true intentions and instead are consistent with Maggie manipulating Ms. Chen and withholding from Ms. Chen, until the later stages, the full scope of Maggie's schemes.

### 1.  Maggie Deceives Ms. Chen About Employees "Frances" and "Julia"

The large volume of emails produced in this case involve conversations between Si Chen and "three" supposed Archangel System Space ("ASSI") agents: Maggie, "Julia Davis", and "Frances Loomis". The bulk of the evidence suggests that "Julia", "Frances", and Maggie are simply Maggie, who used different email accounts and personas to trick vendors and Si Chen into doing Maggie's bidding.

Exhibit 8 is illustrative.  Exhibit 8 is an email exchange between frances@archangel-s.com and Yves Deiss, the General Manager of a company called

---

[2] The smuggling of aerospace or military technology from the United States to China, in violation of export restrictions, would be a serious offense.  If caught engaging in this conduct, an individual could face a significant prison sentence.  For someone like Si Chen, who is living in this country under a spousal visa, the consequences are even greater considering she would face deportation and would be unable to live with her husband and their young U.S. Citizen daughter.

Given the immense risk associated with getting caught and prosecuted, no one would take that risk unless he or she were generously compensated.   For Si Chen, this was not the case.  As detailed in Exhibit 5, Chen only received very small sums for her services, generally only a few hundred dollars per shipment.  Although bank records show thousands of dollars being wired into Chen's account, these funds were used to purchase the actual products that were being shipped or were used to pay for miscellaneous operating costs such as the monthly office lease, the cell phone bill, and shipping expenses, leaving very small amounts as compensation to Ms. Chen.  The emails and bank records produced in discovery corroborate this.  Exhibits 6 and 7 are emails exchanged between Chen and Maggie in which Chen provides Maggie with a brief accounting of how the money was being spent.  After all expenses were paid, Chen was only left with a few hundred dollars – nothing that would justify knowingly agreeing from the outset to take such an immense risk.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

DEFENDANT CHEN'S SENTENCING MEMORANDUM

Keopsys, Inc.  Although the email is clearly from the ASSI email address belonging to "Frances", the sender signs her name as "Maggie".  It appears that Maggie made a mistake and forgot that she was using the "Frances'" email account.

Exhibit 9 is composed of two email messages.  The first email is an exchange between julia@archangel-s.com (supposedly "Julia") and Pam O'Bannon of Applied Systems Engineering, Inc. ("ASE") and contains the shipping information for an order that ASSI made with ASE.  The second email is from maggie@star-ai.com (Maggie) to Si Chen with tracking information pertaining to that same shipment.  It again reflects Maggie's use of the persona "Julia" and "Julia" email account since there was no forwarding e-mail from "Julia" to Maggie and simply a reply from Maggie.

In this case, we have a situation in which this one individual (Maggie) uses multiple email accounts and represents herself as three separate individuals.  In addition to tricking various third-party vendors, Maggie also used this tactic to deceive Si Chen.

Co-conspirators have knowledge of and an agreement to enter into a common criminal enterprise.  This deception by Maggie confirms that she repeatedly misrepresented facts to Ms. Chen and that Ms. Chen did not know the true extent of Maggie's activities.  If Ms. Chen was a knowing and willing participant in Maggie's conspiracy, there would be no reason for Maggie to lie to Chen about these various employees or other important items discussed below, such as the ultimate destination of shipments.

> 2. <u>Maggie Deceives Ms. Chen About Reasons for Shipment Destination and Legality of Shipments</u>

Maggie repeatedly lied to Ms. Chen about the reason that shipments had to be delivered to Hong Kong (thereby concealing the export control-related reason) and falsely reassured Ms. Chen that shipments were legal when they were not.

Instead of truthfully stating the products under export control regulations could not be shipped to China but only could be sent to Hong Kong, Maggie manufactured phony

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

4.

excuses like the false claim that sending to China would delay receipt of the shipments because they would need to be re-shipped from China to Hong Kong.

For example, Exhibit 10 is an email between Maggie and Si Chen regarding an order that ASSI placed with a company called Avnet. This email, which is written in Chinese, roughly translates to Maggie telling Chen:

"Country has to be filled as 'Hong Kong', or the package will arrive in China first, and will have to be transferred to Hong Kong and it will take three weeks."

In actuality, the item had to be sent to Hong Kong because the United States had restrictions on exports to China but not Hong Kong. The fact that Maggie found it necessary to lie to Chen about the rationale for shipping to Hong Kong shows Chen's ignorance and lack of knowledge in the earlier stages about the true nature of Maggie's criminal activities. If there was a knowing conspiracy between the two to export military items to China, there would be no reason for Maggie to offer Ms. Chen false explanations for the destination because both would know where the package was going and why.

In addition, when Ms. Chen asked Maggie for proof that certain shipments to Hong Kong were legal, Maggie sent Ms. Chen a document Maggie claimed to prove the shipment was lawful. Exhibit 11 is a screenshot of a WeChat conversation in Chinese between Maggie and Si Chen. A rough translation confirms that Chen asks Maggie in the conversation to:

"Send me proof that package is legal to export to Hong Kong."

In response to Chen's request, Maggie sends her a picture of a document, which Maggie assures Ms. Chen confirms that the shipment is permitted to be exported to Hong Kong. Maggie then states that she will send additional proof to Chen the next morning.

Common sense dictates that had Chen known that the parts were restricted for export and there was a conspiracy to do so nevertheless, Chen would not have asked Maggie for proof that the shipment was legal because she of course would have known the shipment was illegal. Moreover, had Maggie been honest with Chen about her intentions

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

5.

and Chen had knowledge of Maggie's intentions, Maggie would have had no need to send Chen a document to falsely assure Chen that it was legal to export that item to Hong Kong.

There would be no reason for Ms. Chen to ask for this assurance if she knew they were evading export controls.  The exchange reflects the various important ways Maggie took advantage of Ms. Chen.

### 3.   Maggie Misleads Chen that She Was Trying to Take Advantage of Preferential Prices for U.S. Customers

It is common knowledge that companies often charge different prices depending on where the buyer is located.  A U.S. supplier might charge $1,000 to a company in China for a part, but only $500 to a company based in the United States.

Exhibits 12, 13, 14, 15, and 16 all corroborate this well-known principle of geographic price differentials.   For example, Exhibit 12 is an email between Advanced Technical Materials, Inc. ("ATM") and ASSI in which the ATM representative provides "Julia" with a domestic price quote.  Exhibit 13 is an email between Opto Alignment and ASSI in which the company provides "Julia" with the domestic sales price for its product. Exhibit 14 is a quotation generated by Ward/Davis Associates to ASSI which notes that the quote is only valid if the ultimate destination is within the Unites States.  Exhibit 15 is an email exchange in which Vabyon America Inc. offers ASSI a "local California business discount".  Exhibit 16 is an email between ATM and Special Agent Matt Peterson in which ATM acknowledges that it quoted ASSI a domestic (U.S.) price.

Even the government's own reports recognized this phenomenon.  Exhibit 17 is an excerpt from Special Agent Matt Peterson's Affidavit in which Mr. Peterson acknowledges this notion of domestic pricing.  Specifically, the Special Agent was informed by one of the suppliers in this case that:

> "U.S. Company A offers different pricing for the same components if the components will be exported outside the United States."

In fact, Maggie had a pattern of enlisting Chen to find the best prices for goods.  On multiple occasions, Maggie enlisted Si Chen's help to find legal non-ASSI products in the

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

6.

United States.  For instance, Exhibit 18 is an excerpt from Ms. Chen's proffer with the Government in which she states that Maggie would ask her to go out and compare prices for various goods including iPhones and women's purses.  Similarly, Exhibit 19 is an email from Ms. Chen to Maggie in which Chen provides Maggie with U.S. prices for various cosmetic and beauty products.

This goal of obtaining discounted domestic price quotes is consistent with other elements of Maggie's initial interactions with Si Chen.  For example, as detailed in Exhibit 20, Maggie initially reached out to Si Chen for help in renewing ASSI's corporate status and paying the company's outstanding debts which would be required to qualify for domestic pricing.  As Chen explained during her proffer with the Government (see Exhibit 18), the goal of having Chen renew ASSI's corporate status in Delaware was so that the company could obtain domestic price quotes within the United States.

### 4.   Many of the Products that ASSI Sought Were Available in China

The pertinent U.S. export restrictions in this case were designed to prevent China from illegally obtaining sensitive military technology.  However, many of the products that ASSI sought were available for sale in China and thus, their sensitivity was not obvious.

Exhibits 21, 22, and 23 illustrate situations in which the products that ASSI sought from a vendor and/or supplier were also available for purchase in China.[3]  The fact that these products were already available for purchase in China helps explain why Ms. Chen could believe Maggie's false reassurances throughout most of the relationship.

In fact, the reason that many of these companies would not sell these items to ASSI was because they did not want to usurp sales opportunities from their overseas Chinese counterparts.  Essentially, these companies did not want to be competing with themselves.

---

[3] Exhibit 21 is an email from Maggie to Si Chen written in Chinese which roughly translates to "I spoke with the Chinese suppliers", thereby implying that the product is available in China.

Exhibit 22 is an email from Keopsys, Inc. to "Frances" indicating that a similar request was being handled by the company's Shanghai office.

Exhibit 23 is an email from EPool Technologies Co., Ltd. (a Chinese company) asking that Cathy direct her colleague in China to contact the Chinese supplier to place the order.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

7.

See Exhibit 24 which is an email exchange between Keopsys, Inc. and ASSI in which the Keopsys representative voices concerns over a company (Photline) competing with its own Chinese distributor.

Finally, the fact that Si Chen believed that many of these products were available overseas, and even went so far as to obtain quotes from Chinese suppliers, reflects Chen's misunderstanding throughout most of the relationship about restrictions that the U.S. Government placed on these items, and is consistent with Chen's belief that Maggie was trying to save money by fraudulently misrepresenting the true location of the buyer.

5.   Helping Maggie Avoid Higher Import Taxes and Duties

In addition to helping Maggie obtain preferential domestic pricing, Si Chen also initially believed that by collecting and re-shipping these items and misrepresenting their value, she was enabling Maggie to avoid paying higher Chinese import taxes and duties.

Exhibit 25 relates to an item sought by ASSI which was already available in China. In the exchange, the supplier representative communicating with "Julia" (Maggie) informs Maggie that:

"You do not pay VAT tax for foreign goods, but you will probably have to pay custom fees and delivery."

Maggie instructed Si Chen to falsely value certain shipments at lower dollar amounts to enable Maggie to save on import duties and tariffs.  This also explains why Chen at times would write the name of the actual product but falsely claim it was a "sample" which was another way to eliminate or lower any duties charged.

Maggie (aka "Julia" and/or "Frances") had a pattern of attempting to avoid higher import duties.  For example, Exhibit 26 is an email from "Julia" (Maggie) to Maggie's prior U.S. contact named Rong Nie (whom she used before Ms. Chen until that individual was apparently arrested).  In this email, which is in Chinese, Maggie using the name "Julia" asks Rong Nie to lower the value for a particular shipment because China would require "Julia" to pay additional duty on shipments valued over $2,500.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

8.

6.  Listing the Actual Name of Parts

Si Chen generally would write the actual part name on forms and documents that she filled out.  Had Si Chen truly known from the outset that she was smuggling sensitive military technology overseas via FedEx and other carriers, she clearly would have refrained from listing the actual names of the parts that she was shipping on the shipping forms and invoices.[4]

In the few cases where generic descriptions were used, contemporaneous e-mails reflect it was for convenience sake because, for example, the list of parts might be too long to itemize, and this practice was even consistent with short-hand used by many of the U.S. suppliers in their shipping records when shipping products to Chen.

B.   Ms. Chen's Loss of Her Family and Severe Emotional Hardship

Si Chen is a Chinese citizen and mother of a six-year old girl.  She was arrested at her home on May 23, 2017, in front of her husband and daughter.  She has been held in custody at MDC since that date.  Her husband has only visited her a few times during that nearly 18 months in custody, and Si Chen has not seen her daughter since May 23, 2017.  Following conclusion of her sentence, Ms. Chen will be deported to China, and her husband has advised her that he and their daughter will not return to China to be with her.

To compound this emotional trauma, Ms. Chen's own father has fallen seriously ill back in China following a cerebral hemorrhage.  See, e.g., PSR at ¶ 89.  After the release of the draft PSR, Ms. Chen provided the Probation Office with additional medical records confirming her father's continued serious medical issues, which presumably will be updated in the final PSR.

Confined to MDC for approximately 18 months, separated from her daughter and having learned her husband will abandon her, Ms. Chen has suffered increasing emotional and psychiatric distress while in custody.  After prison authorities did not provide any meaningful help for her severe depression and had her evaluated largely by trainees who simply offered "self-help" strategies, Ms. Chen was eventually hospitalized and placed on

---

[4] Exhibits 27, 28, 29, and 30 are just a few select examples of shipping documents in which Chen lists the actual name of the part contained inside the package.

DEFENDANT CHEN'S SENTENCING MEMORANDUM

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

suicide watch following her attempt to kill herself by repeatedly banging her head against the wall.[5]  Following her hospitalization, she was prescribed CELEXA which may reduce her symptoms of depression and suicidal thoughts but cannot fix the root cause of her depression which is the fact that she has lost everything in this case – her career, an opportunity to live in the U.S., and most importantly, her family.  See, e.g., PSR at ¶¶ 97-101.

## III. SENTENCING GUIDELINE ANALYSIS AND RELATED DISCUSSION

### A. Guidelines Calculations

Count One Base Offense Level: [U.S.S.G. §2M5.1(a)(1)]:                    26

Grouping:

Count Seven (Money Laundering) [U.S.S.G. §2S1.1]              Adds   0
    [Groups with Count One (Evasion of Export Controls)
    See discussion below]

Count Eight (Forgery/False Use of a Passport) [U.S.S.G. § 2L2.2]
                                    Adds   0

    [If treated as separate Group/adds 0 points under Grouping
    pursuant to 3D1.4 because an offense **9** or more levels less serious
    than the Group with the highest offense level is disregarded]

Minor Role Adjustment [U.S.S.G. §3B1.2]                                      -2

Acceptance of Responsibility [U.S.S.G. §3E1.1(a)]                            -3

Total Offense Level                                                          21

Criminal History Category                                                   I

Guideline Range                                                  37 to 46 mos.

---

[5]  In twenty years as a practicing attorney, her counsel has never seen a client with greater depression than Ms. Chen, and that includes a former client who committed suicide.  Ms. Chen would cry and shake for two hours straight during her meetings with counsel, something which her counsel has never witnessed before and for which he strongly encouraged her to seek medical help.  Counsel was disappointed with how this severe depression was initially handled by MDC staff.

  In twenty years of practice, her counsel also has never seen a less supportive spouse than her husband who refused to make an effort to visit her even once per month when counsel informed him of the depth of his wife's severe depression, counsel's concerns about his wife's risk of suicide, and his wife's need for emotional support and despite the fact that counsel specifically asked the husband to visit his wife at least once per month.

DEFENDANT CHEN'S SENTENCING MEMORANDUM

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

B.  Grouping Analysis

Pursuant to the Federal Sentencing Guidelines, "all counts involving substantially the same harm shall be grouped together into a single group.  Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction, or

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

[U.S.S.G. §3D1.2(a) and (b)]

Comment 2 to § 3D1.2 states that "[f]or offenses in which there are no identifiable victims (i.e., drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed.  In such cases, the counts are grouped together when the societal interests that are harmed are closely related."  In the present case, Si Chen's offense harmed the societal interest in restricting the export of sensitive technology.  Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA") in violation of 50 U.S.C. § 1705(a), (c), 15 C.F.R. §§ 742.4, 742.6, 758.1, 764.2, part 774.  Si Chen was also charged and pled to International Promotional Money Laundering in violation of 18 U.S.C. § 1956(a)(2)(A).  The promotional money laundering was comprised of the bank transfers to Ms. Chen's account which she used to pay for the products that were shipped in violation of export controls.  The money laundering was an act in furtherance of the export control violations, not an independent scheme or plan and therefore, the counts must be grouped together.

Additionally, comment 4 to Section 3D1.2 states that "[s]ubsection (b) provides that counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times."[6]

---

[6] There is no separate harm caused by the promotional money laundering other than the societal harm from the export control offense.  Comment 4 contains the example: "The defendant is convicted of one count of auto theft and one count of altering the vehicle identification number of the car he stole…. The counts are

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

11.

In 2001, the Sentencing Guidelines were amended to make even more clear that money laundering and the underlying offense must be grouped.

U.S.S.G. § 2S1.1, Comment 6, Grouping of Multiple Counts, provides that "[i]n a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of § 3D1.2 (Groups of Closely-Related Counts)."

C. Effect of Grouping

Pursuant to §3D1.3, in the case of counts grouped together pursuant to §3D1.2(a)-(c), the offense level applicable to a Group is the offense level for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in that Group. The offense level for the Count One (IIEPA Conspiracy) and Count Seven (Money Laundering) group would be 26.

Defendant has also pled to Count Eight Forgery/False Use of Passport in violation of 18 U.S.C. §1543. *Even if that offense is treated as a separate group from the Counts 1 & 7 group* (and there is an argument it should be part of that same group as it aided the shipments), the offense level for Si Chen's use of a false passport under U.S.S.G. §2L2.2 is **10** (a base offense level of **8**, plus **2** for use of a foreign passport).

Pursuant to U.S.S.G. §3D1.4 "any Group that is **9** or more levels less serious than the Group with the highest offense level" is disregarded. An offense level of 10 for Passport Fraud is 16 levels below 26 for the Count One/Count Seven Group. Therefore, even if treated as a separate group, Count 8 (False Use of a Passport) would be disregarded and would still have no impact on Si Chen's total adjusted offense level.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

---

to be grouped together." The altering of the vehicle identification number is only done to complete the effectuation of the auto theft, (i.e. without altering the vehicle identification number the criminal purpose of the car theft could not be accomplished), therefore the guidelines mandate the counts be grouped, even though they are separate criminal acts. In the present case, Ms. Chen's money laundering (the bank transfers from Maggie to Chen) was only conducted to pay for the products to be purchased. Therefore, the guidelines similarly mandate that the counts be treated as a single group with a single objective.

12.

D. <u>Two-Level Sentencing Enhancement for Money Laundering Should Not Be Applied At Least for Equitable Reasons Under Section 3553</u>

The gravamen of Si Chen's conduct was her assistance with shipping products out of the United States that were subject to export controls. All other offenses were in reality incidental to that conduct. As such, the export control conspiracy should be the basis of Si Chen's punishment.

However, the Draft PSR in its calculations uses the Guideline offense level for money laundering and then, applies a two-level enhancement for promotional money laundering, which would make Si Chen's offense level 28, instead of the 26 as an export control offense under USSG §2M5.1(a)(1)(A).

The practical effect of doing so is to treat as more serious than the export control offenses what was otherwise innocuous bank transfers, even though there was no concealment activity or other features which created a separate or greater harm than the underlying export control offense.

An enhanced sentence for International Promotional Money Laundering in this case is neither necessary nor fair as the transactions were innocuous and incidental. The "financial transactions" here did not involve the types of activities money laundering statutes are generally targeted towards. Here, money was generally transferred to Chen in her own name and into accounts titled to her using her true name and address. Those bank transfers were simply used to pay the vendor invoices and there was nothing untoward about the transactions. In fact, these financial transactions were a necessary part of purchasing the products and would have been structured in the identical manner even if the products had not been subject to any export controls, as was the case with many of the lawful shipments made by Chen. In addition, Chen did not engage in concealment activities, whether through the use of accounts titled in the name of fictitious entities or third parties, or by trying to create the false impression that the money received from Maggie to pay invoices was somehow revenue generated from some other form of business activity.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

13.

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

In the interest of justice, the Court should not apply the two-point adjustment for money laundering recommended in the draft PSR and should simply use as the starting point for her sentence a guideline based upon a level 26 for her export control offense before applying adjustments for being a minor participant and for her acceptance of responsibility.

E.   §3553 Variance is Appropriate to Provide Proportionate Punishment and to Reflect the Depth that Ms. Chen Has Suffered in Her 18 Months of Custody and Will Suffer with Her Deportation

If the above adjustments/reductions are made, Ms. Chen's guideline range would be 37 to 46 months, which we still suggest is excessive in her case.

In the end, "[t]he court shall impose a sentence sufficient, but not greater than necessary…."  In making this determination that court shall consider: 1) the nature and circumstances of the offense and the defendant's history; 2) the need for the sentence to reflect the seriousness of the crime; 3) the need of the sentence to afford adequate deterrence; 4) protect the public from further crimes of the defendant; and 5) provide the defendant with needed education or training.  18 U.S.C. §3553.

Although Ms. Chen recognizes that sending restricted technology to China is a serious crime, for which she has accepted responsibility, she was initially deceived into the scheme by Maggie, and her conduct while sufficient for liability purposes stands in contrast to others who commit those same offenses.

Ms. Chen was a CPA and young mother trying to build a business and professional network in a new country and stupidly agreed to help someone with their shipments in exchange for modest compensation with the hope it would someday turn into a more meaningful business relationship.  At one point, Maggie even suggested Ms. Chen might be her U.S. rep for the import of Chinese consumer products into the United States.

Chen came to the United States to begin a new life. She began a career as an accountant and started a family.  Ms. Chen viewed her interactions with Maggie as a business opportunity.  Despite the minimal compensation, Chen was hoping that if she

14.

1  helped this Chinese businesswoman ship products to China, it might create a business

2  opportunity for her down the line.

3      She believed initially that Maggie was both attempting to take advantage of lower

4  prices for domestic purchasers (and needed someone to act as a U.S. purchaser) and that

5  Maggie was attempting to reduce Chinese import duties by under-declaring the value of

6  the shipped goods.

7      Consistent with this, Maggie even asked Ms. Chen to research pricing for cell

8  phones, cosmetics and other items that could be purchased more cheaply in the U.S. and

9  then exported to China for resale.  Although Ms. Chen thought her conduct was helping

10  her Chinese contact evade Chinese import duties and improperly access domestic pricing

11  offered by U.S. suppliers, she did not until much later fully appreciate Maggie's true

12  scheme to export products subject to export controls.

13      In sum, Ms. Chen was not a foreign agent who came to the United States to steal

14  technology for the Chinese government.  And she should not be sentenced like she was.

15      Maggie took advantage of Ms. Chen for her own purposes and exposed Chen to

16  dangerous criminal liability, while Maggie plotted against the United States from the

17  safety of China.  It would be unjust to sentence Ms. Chen as if she were an agent engaged

18  in a premeditated plot against the United States.

19      From her employment as a Certified Public Accountant, the fact that she was a

20  young mother, her receipt of very minimal compensation for her help with the shipments,

21  and from e-mails and other communications from Maggie, Chen was repeatedly lied to and

22  got herself caught up in something she likely never would have agreed to had she known

23  from the outset Maggie's true designs.  Instead, she learned about Maggie's scheme much

24  later and by then did not have the strength to pull out.[7]

25

26  [7] As outlined in a September 16, 2018 objection, the Draft PSR included in paragraph 44 a discussion that in 2009, Si
Chen worked "as an unpaid intern at D3 Technologies, an engineering firm involved in the design of military aircraft

27  pursuant to contracts with various defense contractors, located in San Diego, California.  On her first day of work,
Chen received training in export compliance, proprietary information and security.  The export compliance training

28  included an overview of the International Traffic in Arms Regulation ("ITAR"), the Export Administration
Regulations ("EAR"), and the associated penalties for violations, including imprisonment."

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

15.

From a specific deterrence standpoint, Chen has no prior criminal history, and there is no evidence she is predisposed towards evasion of export controls, will attempt to again engage in similar acts after being deported to China, or will engage in any other future criminal conduct. After approximately 18 months in custody, the destruction of her personal and professional life, and the harm she has suffered to her psychological well-being, additional punishment is not necessary to deter her specifically. Furthermore, she will be deported to China so she will no longer have an opportunity to commit crimes in the United States.

As for general deterrence, an approximately 18-month custodial sentence is a significant prison sentence, and when coupled with the consequences of deportation and permanent separation from one's family, this punishment is more than sufficient to deter similarly situated persons considering export control violations. Although the sentencing guidelines suggest a range of 36-47 months, the severe hardships suffered by Chen make it clear that her approximately 18-month sentence and related consequences represent stiff punishment. Put another way, if Ms. Chen at the outset would have been aware of everything she would lose by getting involved (her career, living in the U.S. and her family), it is highly unlikely she would have complied with Maggie's requests. Her sentence in the full context of the related consequences of deportation and separation from family is sufficient to promote respect for the law.

---

Ms. Chen objected to this discussion as misleading because it overstated her training and implied constructive knowledge of export control laws. The implication of it was that Ms. Chen received extensive training. In actuality, Ms. Chen was only present for an approximately twenty-minute orientation on her first day of work *as an unpaid intern in the accounting department*. In her accounting internship, she had no access to export-controlled information or items. Indeed, the sign-in sheet produced by the prosecution refers to the event as a: "Export Compliance, Proprietary Information and Security Briefing" (emphasis added). As the word "briefing" implies, she received an overview or briefing of the general subject as a part of the orientation on the first day of her unpaid internship, not a detailed training seminar educating her on the specific details of export control laws.

Prosecutors produced in discovery the interview with Brian Foxe, the presenter of the briefing (whose job was ensuring company compliance with export control laws and who, when interviewed by law enforcement agents, had an incentive to overstate the training given). In that interview, Mr. Foxe also refers to the information he gave to Si Chen as a "briefing." He also confirms that Si Chen's job was in accounting, completely unrelated to any department in which she would have had access to military related technology, and confirmed that any computer she worked on during her internship was "airgapped" from the main company "intranet." Additionally, Mr. Foxe acknowledged that D3 rarely exports physical items and most of their work is purely design work.

DEFENDANT CHEN'S SENTENCING MEMORANDUM

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

An eighteen-month sentence in custody is a sufficient sentence for retributive purposes, considering that Ms. Chen was used by a Chinese agent like Maggie. Additionally, she has suffered significant emotional and psychiatric distress while in prison as she grapples with the loss of her husband and daughter.  No reasonable onlooker would think that Si Chen got away easy after she spent eighteen months in custody, suffered severe depression and an attempted suicide, and will be separated from her daughter forever after being deported to China.  We submit imposing additional prison is unnecessary and borders on being cruel.

To her credit, despite her extreme difficulty in prison, she has participated in and completed many educational and religious classes and as reflected in records provided to the Probation Office, she has also worked very diligently in her prison job.[8]  See Exhibit 31.  These efforts suggest that if she can overcome the extreme emotional hardship of losing her daughter following deportation, she has the work ethic to become a productive member of society in China following her deportation.

In support of our efforts for leniency, Si Chen's family and friends have also submitted the attached letters to the Court.  See Exhibit 32.

In sum, her approximately eighteen-months confinement to date is sufficient punishment to meet the objectives of Section 3553.

F.     No Fine Is Necessary

Not withstanding the fine range under the Guidelines, no fine is necessary or appropriate in this case.  In short, Ms. Chen has been incarcerated without income the past 18 months, will be deported and have to completely restart her life in China without her daughter or financial support from her husband, and whatever community property still exists will have to be divided after what likely will be a divorce.  Furthermore, she owes nearly $75,000 to her family who advanced legal fees on her behalf and will likely need to

BRAUN & BRAUN LLP
10250 CONSTELLATION BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90067

---

[8] Including taking classes in Geometry, Health, Marine Biology, Drama, History, Gardening, Journalism, and Philosophy.

17.

hire a family law lawyer to attempt to enforce visitation rights following her deportation to China.  Realistically, Ms. Chen will not have the resources to pay a fine.

## IV.    CONCLUSION

For the above reasons, and any other argument or evidence that may be offered at a hearing on this matter, Ms. Chen requests the Court impose a sentence of eighteen-months imprisonment with no fine.

Respectfully Submitted,

Dated:    September 17, 2018                                  BRAUN & BRAUN LLP

                                                                  By:    /s/ Adam H. Braun
                                                                         Adam H. Braun
                                                                         Attorney for Defendant
                                                                         SI CHEN

18.