NICOLA T. HANNA
United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Litigation Counsel, National Security Division
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-7280
    Facsimile: (213) 894-2927
    E-mail:   judith.heinz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>SI CHEN,<br>  aka "Cathy Chen,"<br>  aka "Celia Chen,"<br>  aka "Cecilia Chen,"<br>  aka "Chunping Ji,"<br><br>       Defendant. | No. CR 17-254(A)-CJC<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM<br><br>Hearing Date: October 1, 2018<br>Hearing Time: 11:00 a.m.<br>Location: Courtroom of the Hon.<br>         Cormac J. Carney |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Judith A. Heinz hereby submits its response to defendant Si Chen's sentencing memorandum.  The government requests that the Court consider at sentencing the attached response to defendant's sentencing memorandum, the government's sentencing position, the presentence investigation report, the recommendation letter, the files and

records of this case, and such further argument as this Court may permit.

Dated: September 24, 2018          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division

/s/
JUDITH A. HEINZ
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3      Defendant Si Chen ("defendant") claims she is the victim in this

4    case.  She contends she was deceived, misled, and manipulated by

5    coconspirator "Maggie."  She expresses no remorse for her crimes, nor

6    does she acknowledge the grave harm she and her coconspirators have

7    inflicted on the national security of the United States.  Defendant's

8    arguments, at least in part, are inconsistent with her guilty pleas

9    and her admissions in her plea agreement (which she affirmed under

10   oath during her change of plea hearing).  The custodial sentence

11   recommended by the Probation Office and the government is necessary

12   to fulfill the purposes of sentencing.

13   **II.   DEFENDANT ACTED KNOWINGLY AND WILLFULLY AT ALL RELEVANT TIMES**

14     When defendant entered her guilty pleas she admitted under oath

15   she acted knowingly and willfully when committing her crimes.

16   Defendant's plea agreement contains a lengthy and detailed factual

17   basis.  During the change of plea hearing, defendant admitted under

18   oath that all the facts in the factual basis were true.  However,

19   defendant now argues, inconsistent with her guilty pleas, that she

20   was not a knowing and willful participant in the IEEPA conspiracy.

21     **A.    Defendant Knew Before She Ever Met "Maggie" That U.S. Law**
22       **Prohibits the Shipping of Many Technological Items to Hong Kong and China.**

23     Before she ever met coconspirator "Maggie" or began working at

24   Northern University where she began shipping packages to Hong

25   Kong/China for "Debi/Maggie" and ASSI, defendant received training in

26   U.S. export control law.  On June 15, 2009, defendant began working

27   at D3 Technologies in San Diego, California, as an accounting intern.

28   D3 Technologies provided computer-based engineering services for

Lockheed Martin, Boeing, and other defense contractors.  See GEX 6, at 13, 15.[1]  The export compliance training that defendant received at D3 Technologies included an overview of the International Traffic in Arms Regulations ("ITAR"), Export Administration Regulations ("EAR"), and the associated penalties for violations, including imprisonment and fines.  Id. at 15.  Defendant received this training because D3 Technologies' technical data was primarily ITAR and EAR-controlled.  Id.  Defendant attempts to discount the export compliance training she received at D3 Technologies as "brief" and part of a "twenty-minute orientation."  Def. Position at 15-16, n.7. The evidence does not support her contentions.  Rather, the evidence shows the training defendant received was based on a "Project Shield America" export control training provided to D3 Technologies by U.S. Immigration and Customs Enforcement.  GEX 6, at 15-16.  There is no reason to believe that defendant did not understand, after receiving the export compliance training at D3 Technologies, that U.S. law prohibited the shipping of many technological items to Hong Kong and China, and the associated penalties included imprisonment.

**B.  Defendant Was Not Deceived by "Maggie"'s Use of Aliases.**

After working at D3 Technologies for approximately one year, in March 2010, defendant started work as an accountant at Northern University, in Los Angeles.  PSR ¶¶ 45, 114.  The government's sentencing position memorandum discussed the evidence showing that defendant began shipping packages for ASSI (or an affiliated entity) and coconspirator "Maggie" (aka "Debi Mills"), in May 2010, while working at Northern University.  That evidence also shows that

---

[1] "GEX" refers to the attached exhibits and is followed by the applicable exhibit number, and applicable page number.

defendant understood, no later than March 2013, that coconspirator "Maggie" used aliases, including "Debi Mills." Defendant has admitted that in March 2013, defendant herself began using the alias "Cathy Chen" and a new cell phone number operated with a disposable phone card, when communicating with ASSI customers as "Purchasing Manager, Archangel Systems Space, Inc." Plea Agreement at 9-10. Defendant has admitted further that in September 2014, she began using an alias and a counterfeit Chinese passport supplied by "Maggie" in the same alias. Id. Thus, defendant's claim she was deceived by "Maggie"'s use of aliases is unpersuasive.

**C. Defendant Was Informed By a Customs and Border Protection Officer in June 2015 That It Was Illegal to Export Certain Technology From the U.S. Without a License.**

In addition to receiving export compliance training in June 2009 at D3 Technologies, a Customs and Border Protection ("CBP") Officer advised defendant in 2015 regarding U.S. export control law. On June 29, 2015, a CBP Officer responded to an e-mail from "Chun Ping Ji" (defendant's alias on the counterfeit Chinese passport) at defendant's ASSI e-mail address (cathy@archangel-s.com), regarding one of defendant's shipments that CBP had detained, as follows:

> Dear Ms. Ji,
>
> Thank you for your e-mail. Officer Cox forwarded me your e-mail as I am the officer who has been assigned to handle your Customs hold (FedEx 805863853381). In order for us to expedite the examination of this shipment, please provide the following:
>
> -End user information (use the attached BIS-711 to fill out).
> -Invoice for samples.
> -As well as every other document pertaining to this shipment.

3

1    　　　　Please be advised of the importance of accurately
filling out export paperwork, as misdeclaring goods
2    and/or failing to file accurate export paperwork
(Shipper's Export Declarations or Electronic Export
3    Information) is a federal offense, as is lying to a
federal officer.  You can find more information here:
4    https://www.law.cornell.edu/uscode/text/13/305

5
　　　　Also, because of the sophisticated nature of these
6    items, please be aware that some components may be
restricted for export from the United States and may
7    require a license from either the U.S. Department of
Commerce (DOC) or U.S. Department of State (DOS).
8    Please reference the DOC website for any items that may
have a "dual-use" application:
9

10   　　　　http://www.bis.doc.gov/index.php/licensing/commerc
e-control-list-classification/commerce-control-list-
11   ccl/17-regulations/139-commerce-control-list-ccl

12
　　　　Please reference the DOS website for licensing
13   procedures regarding defense articles:

14   　　　　http://pmddtc.state.gov/licensing/

15
　　　　Please comply with my request as soon as possible.
16   The sooner I receive those documents, the sooner I can
possibly release your goods.
17
Please let me know if you have any questions.
18
Thank you,
19
[name]
20   CBP Officer
Outbound Enforcement Officer
21

22   GEX 7, at 18.  Thus, once again, in June 2015, defendant received

23   full advisement regarding U.S. export control law.

24   　　　D.   **Defendant Was Not Deceived By "Maggie" About the
　　　　　　　Destination and Illegality of the Shipments.**
25

26   　　　Defendant's assertion that she was deceived by "Maggie" about

27   the destination and illegality of the shipments is without merit.   In

28   an interview on June 22, 2016, defendant stated that she believed the

4

ASSI shipments were going to China, and related an incident that
occurred in 2010, when she was working at Northern University, in
which she mistakenly sent a package to "Maggie." Defendant stated
that she called "Maggie" and asked if she could return the package,
but "Maggie" responded that the package had already gone to China.
Defendant stated this was why she believed that the ASSI shipments
were going to China. GEX 8, at 20. In the same interview, defendant
said that Maggie reminded her to write "Hong Kong," not "China," as
the country destination on packages because defendant once
incorrectly completed a shipping form with "Hong Kong" as the city
and "China" as the country and FedEx refused to return the package.
Id. Nor is it true, as defendant argues, that the export-controlled
items could be shipped to Hong Kong legally without a license.
Defendant's shipment of the Low Noise Amplifiers to Hong Kong on
August 27, 2015 required an export license for national security
reasons. GEX 9, at 22.

Finally, defendant points to a WeChat text on December 4, 2015,
in which defendant states to "Maggie:" "Send me proof that package is
legal to export to Hong Kong." Defendant argues that this text
evidences she did not know the shipment was illegal. This argument
is completely inconsistent with defendant's guilty plea to the IEEPA
conspiracy. As defendant admitted in her plea agreement and during
her change of plea hearing, on November 24, 2015, defendant presented
a package containing 173 digital-to-analog converters ("DACs") to a
U.S. based shipping company for export to Star Aero ("Maggie") at the
Hong Kong address. Plea Agreement at 14. ASSI had paid $10,354.45
for the DACS. Id. at 13-14. The package initially had six stickers
on it warning (accurately) that the contents were controlled for

5

export from the United States and required a license from the United
States Government to be exported.  Yet, when defendant presented the
package to the shipping company on November 24, 2015, the stickers
had been removed.  Id.  After defendant left this package with the
shipping company, law enforcement seized the package from the
shipper, who subsequently informed defendant the package had been
seized by the government.  Thus, when the December 4, 2015 WeChat
text is considered in relation to other contemporaneous events, its
meaning and purpose are clear -- defendant and Maggie were
collaborating on how they might convince law enforcement to return to
defendant the seized "DACs."

> **E.   Defendant Was Not Deceived By Other Factors Such As Preferential Pricing, the Availability of Products in China, and the Avoidance of Taxes and Duties.**

Defendant argues unpersuasively that additional factors show
that she did not knowingly and willfully participate in the IEEPA
conspiracy to which she pled guilty.  Defendant argues that "Maggie"
misled her about the reason the conspirators represented falsely to
suppliers that the products being purchased would not be exported –
that the reason for this was to obtain preferential prices for U.S.
customers.  Defendant argues further that many of the products sought
by ASSI were available in China, and that she reasonably believed she
was helping "Maggie" avoid higher import taxes and duties.  While
defendant may have thought she was helping "Maggie" to obtain
preferential pricing and avoid import taxes and duties, defendant
also knew that U.S. law prohibited the export of certain technology
from the U.S. to Hong Kong and China.  Further, although defendant
did not have an engineering background, she knew everything she was
shipping to Hong Kong and China for "Maggie" was sophisticated

technology.  Defendant also knew, based on her export compliance training at D3 Technologies and the advisement she received from the CBP Officer, that her actions were furthering the goals of a conspiracy to violate U.S. export law.  Defendant argues that had she known she was violating the law by shipping the sophisticated technology to Hong Kong and China, she would not have listed the actual names of the components on shipping documents.  In fact, on the exhibits defendant offers, she did not list the actual names of items, but provided only generic names (without any manufacturer or part number identification) as well as grossly inaccurate values for the items.  Defendant also used her Chinese counterfeit passport alias on the shipping documents, and provided incomplete inventories of the components within shipments.  Defendant knew that by grossly undervaluing the shipments, she circumvented the filing of electronic export information through the Automated Export System – thereby helping to conceal discovery of the conspiracy by U.S. law enforcement.  Thus, defendant's arguments that she was not responsible for her crimes, but committed them only because she was deceived by her coconspirators, are soundly refuted by the evidence before the Court, including defendant's own admissions.

**III. THE PSR CORRECTLY APPLIED THE MONEY-LAUNDERING GUIDELINE**

Defendant argues the Court should not apply the money-laundering guideline in calculating defendant's advisory guideline sentence for "equitable reasons."  Defendant cites no statute, case, or guideline in support of her argument but simply invites the Court to calculate defendant's guideline range incorrectly.  See United States v. Carty, 520 F.3d 984, 993 (9th Cir. 2008) ("procedural error for a district court . . . to calculate incorrectly -- the Guidelines range").

1    Nor do "equitable reasons" support a downward variance from the
2    total offense level generated, in part, by defendant's money-
3    laundering.  The wire-transfer of $26,000, on September 30, 2014,
4    from Shenzhen, China, to defendant's bank account in Southern
5    California permitted the coconspirators to pay for 66 microwave
6    components having space communications applications with funds from a
7    U.S. bank account.  Plea Agreement at 11-12.  This money transfer
8    promoted the conspirators' unlawful activity -- specifically, the
9    smuggling, export control violations, and IEEPA conspiracy.  Not only
10   did the laundered funds pay for 66 microwave components, using funds
11   from a U.S. bank account to pay for these items helped conceal that
12   the end user of the items was located in China, and impeded law
13   enforcement's detection of the IEEPA conspiracy.

14       Defendant argues that the Court should ignore her money-
15   laundering for purposes of sentencing because the funds were
16   transferred into an account held in her own name.  The sentencing
17   guidelines do not support this argument.  Instead, the guidelines
18   apply an additional 2-level increase (in addition to the 2 levels
19   recommended by the PSR) when the money-laundering offense to which
20   defendant pled guilty involves "sophisticated laundering."  USSG
21   § 2S1.1(b)(3).  Under the guidelines, "sophisticated laundering"
22   typically involves the use, inter alia, of fictitious entities, shell
23   corporations, or offshore financial accounts.  Although the wire-
24   transfer here originated from an offshore account, neither the PSR
25   nor the government has recommended the additional 2-level upward
26   adjustment for sophisticated money-laundering because the funds were
27   transferred into a bank account in defendant's name.  Thus, the
28   sophistication of the money-laundering is already considered in the

8

guidelines, the upward adjustment has not been applied, and the variance sought by defendant based on lack of sophistication is not warranted here.

## IV. POSSIBLE COLLATERAL CONSEQUENCES DO NOT WARRANT A SENTENCE BELOW THAT RECOMMENDED BY THE PROBATION OFFICE AND THE GOVERNMENT

Defendant argues that the collateral consequences of her arrest and conviction -- separation from family, possible deportation, depression -- warrant a "time-served" sentence (approximately 18 months imprisonment). Imposition of a "time-served" sentence would constitute an extraordinary variance from the low-end guideline sentence of 46 months imprisonment recommended by the Probation Office and the government. Such a variance is unjustified.

Both the Probation Office and the government have considered the collateral consequences set forth by defendant in making their recommendations to the Court. Separation from family, including separation from children and a spouse, is a consequence shared by nearly all defendants -- and is directly attributable to their own conduct. Defendant argues that she will be separated from her daughter forever, but this is not at all certain. While defendant faces deportation proceedings as a result of her crimes, she can challenge that consequence in immigration court. Although defendant's spouse may wish to remain in the United States, there is no certainty he will be permitted to do so; he is present here based only on a temporary work visa. Nor does depression distinguish defendant from other defendants; however, fortunately, defendant's depression is responding to treatment. Defendant's argument that her deportation alone is sufficient deterrence is without merit; her deportation is not certain and defendant can, as her coconspirators

9

did here, violate U.S. law while in China.   Therefore, the collateral consequences of defendant's crimes do not justify a sentence lower than that recommended by the Probation Office.

## V.   CONCLUSION

Defendant's crimes are extremely serious; they have exposed the national security of the United States to grave danger.   Defendant herself describes her coconspirator "Maggie" as a "Chinese agent" who "plotted against the United States."   (Def. Position at 15, 17.) Contrary to defendant's arguments, she was not manipulated by her coconspirator, nor was she deceived or misled.   As she admitted during her change of plea hearing, "[a]t all relevant times, defendant acted knowingly and with the knowledge that her conduct was unlawful."

Defendant knew she was participating in a conspiracy to violate U.S. export law.   She knew she was shipping sophisticated technology to China to people she had never met and knew little about. Defendant knew, based on her training at D3 Technologies and her communications with a CBP Officer that under U.S. law, the export of certain technology to China was unlawful and punishable by imprisonment.   Defendant took multiple affirmative steps to conceal her participation in the conspiracy because she knew it was illegal. She played a minor, yet crucial role in the conspiracy.

Defendant's crimes require a sentence that will promote respect for export control laws, and deter defendant and others from violating them.   For all the reasons above, the government joins the Probation Office in recommending the Court sentence defendant to a term of imprisonment of 46 months, three years of supervised release, a $20,000 fine, and a $300 special assessment.

# EXHIBIT 6



| Training Record for: | Export Compliance, Proprietary Information and Security Briefing | | |
|---|---|---|---|
| Presented By: | Brian Foxe | Date: | 6/15/2008 |
| **Attendees** | | | |
| Location (SD,WA,GV, DFW) | Print Name | | Signature |
| | | | |
| SD | Si Chen | | Si Chen |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SC  00093712
Form D3-PR7000-7.3



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

**ICE**



05/12/2017 13:54 EDT                                                    Page 2 of 3

## DETAILS OF INVESTIGATION

Evidence uncovered in this investigation indicates that Si CHEN previously worked as an intern for a company called D3 Technologies, based in San Diego, California. According to open-source information, D3 Technologies is an engineering firm involved in the design of military aircraft and has contracts with Lockheed Martin and other defense firms. Specifically, the investigative team observed an e-mail in CHEN's personal e-mail account, c.si.china@hotmail.com, which was searched pursuant to CHEN's consent, sent on or about June 5, 2009, from rpascua-aujero@d3tech. com to c.si.china@hotmail.com and ym1024@hotmail.com. The e-mail, titled "Volunteer Orientation and ITAR Training," reads:

> Hi Si and Mingtao,
>
> Please report on June 15 at 8:00 AM for your volunteer orientation and ITAR training. Let me know if it does not work with your schedule.
>
> Below is our office address:
>
> 4838 Ronson Court
>
> San Diego, CA 92111
>
> Roselyn
>
> ROSELYN D. PASCUA-AUJERO | Project Accountant, A/R Supervisor, Finance Department | D3 Technologies

On or about April 25, 2017, HSI Special Agent (SA) Peterson sent an Export Enforcement subpoena to D3 Technologies and LMI Aerospace requesting records associated with Si CHEN's employment. (AGENT NOTE: Open-source information indicates that D3 Technologies was purchased by LMI Aerospace, which is based in St. Charles, Missouri. END NOTE)

SA Peterson received a voicemail from Robin Grover, Human Resources Manager for LMI Aerospace, on or about April 28, 2017, requesting background information on the subpoena. SA Peterson returned the call the same day and spoke with Ms. Grover regarding the subpoena. According to Ms. Grover, Si CHEN was an employee with D3 Technologies for approximately one year beginning in 2009. Ms. Grover added that it was before Ms. Grover's time in Human Resources, and that CHEN's employment records had likely been shipped off to an off-site warehouse. Ms. Grover noted that it was the practice of D3 Technologies at the time of CHEN's employment to provide export compliance training to all new employees, but that the security officer employed by D3

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ANGEL FIRE | -051 | 5/11/2017 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

SC-00093729



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



**ICE**

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/12/2017 13:54 EDT                                                                                    Page 3 of 3

Technologies at that time, Brian Foxe, had since moved on to another company.  Ms. Grover agreed
to order CHEN's employment file from the warehouse, and told SA Peterson that she would produce
a scanned copy once received.

On or about May 4, 2017, Ms. Grover e-mailed SA Peterson a scanned copy of CHEN's employment
file.  SA Peterson reviewed the file, and observed one document included in the file indicating
that CHEN had attended an "Export Compliance, Proprietary Information, and Security Briefing" on
June 15, 2009.  The document indicates that the briefing was presented by Brian Foxe.

This investigation is ongoing.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ANGEL FIRE | -051 |  |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

14

SC_00093730



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



**ICE**

05/12/2017 13:55 EDT                                                                 Page 2 of 3

## DETAILS OF INVESTIGATION

On May 8, 2017, HSI Special Agent (SA) Matt Peterson called Brian Foxe at phone number ▉▉▉▉▉ and left a voicemail identifying himself as an SA with HSI, providing his contact information, and requesting to speak to Mr. Foxe about a former employee of D3 Technologies. SA Peterson received a return call from Mr. Foxe the following day, May 9, 2017, from phone number ▉▉▉▉▉ at approximately 1458 hours. The following is a synopsis of the call:

SA Peterson explained that he was seeking background information on a former D3 Technologies intern employee who may have received an export control briefing from Mr. Foxe. Mr. Foxe asked the time period; SA Peterson told him it was 2009. Mr. Foxe noted that at that time, all new D3 employees, including interns, received export control briefings, which included an overview of the International Traffic in Arms Regulations (ITAR), Export Administration Regulations (EAR), and the associated penalties for violations, including imprisonment, fines, and in the case of the ITAR, debarment. Mr. Foxe asked for the name of the employee SA Peterson was inquiring about. SA Peterson provided the last name "CHEN." Mr. Foxe responded that he remembered a "Si CHEN," who was an accounting intern in approximately 2009. Mr. Foxe continued that he recalled that CHEN was one of three interns during that time period from National University (NU), a university in the San Diego area. Mr. Foxe stated that he recalled that CHEN, as well as the other two interns, were Chinese nationals. Mr. Foxe added that they were classmates of fellow NU graduate student Roselyn Pascua-Aujero, a Project Accountant at D3 Technologies, and that they were going to assist with accounting tasks at D3 Technologies.

Mr. Foxe stated that he was alarmed at the possibility of three non-citizens having access to D3 Technologies technical data, which was primarily ITAR and EAR-controlled. Accordingly, Mr. Foxe stated that he took steps to "isolate" the three interns and ensure they did not have access to the D3 intranet, which could have been a potential "deemed export" violation. Mr. Foxe reported that the interns, including CHEN, were provided accounting data on a thumb-drive and processed the data on a "sandboxed" computer that was "air gapped" from the rest of the D3 network.

Mr. Foxe stated that D3 did not typically export physical items, as the company was primarily involved in computer-based engineering services for other aerospace firms, including Lockheed Martin and Boeing. Mr. Foxe assessed that during his time at D3, there were approximately six exports that he was aware of.

SA Peterson asked Mr. Foxe if he recalled any specific security violations associated with CHEN or the other interns. Mr. Foxe responded that he did not recall any specific security violation committed by CHEN or the others, but did recall that there was "something funny" about the dates

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ANGEL FIRE | ▉▉▉-053 | ▉▉/▉▉/2017 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

SC_00093732



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

**ICE**



---

05/12/2017 13:55 EDT

Page 3 of 3

on CHEN's visa, which seemed "flaky" and in general, did not seem consistent with her dates of purported attendance at NU. Mr. Foxe stated that he expressed this concern to D3 Human Resources (HR), who reportedly received a document from NU that was satisfactory to D3 HR.

Mr. Foxe stated that he recalls that shortly before CHEN's security briefing, he had received an export-control outreach from SAs with Immigration and Customs Enforcement (ICE), which he incorporated into his export control presentation. Mr. Foxe noted that he would look for the export control briefing from D3, but if SA Peterson could acquire the current D3 export control briefing, he could advise SA Peterson if anything was different. Mr. Foxe reported that Renee Skonier was the current export compliance officer at D3 Technologies, which had been absorbed by LMI Aerospace. (AGENT NOTE: HSI investigative database checks indicate that D3 Technologies was provided with a Project Shield America export control briefing in March 2009. The ROI documenting the outreach indicates that Mr. Foxe was in attendance. END NOTE)

Mr. Foxe said that he would be willing to testify to everything that he discussed with SA Peterson.

The call ended at approximately 1514 hours.

This investigation is ongoing.

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ANGEL FIRE | -053 |  |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

SO_00093733

16

# EXHIBIT 7

-------- Original Message --------
Subject: FW: FW: packages hold by Customs
From: "KNIPP, KEVIN M" <KEVIN.M.KNIPP@cbp.dhs.gov>
Date: Mon, June 29, 2015 4:15 pm
To: "cathy@archangel-s.com" <cathy@archangel-s.com>

Dear Ms. Ji,

Thank you for your e-mail. Officer Cox forwarded me your e-mail
as I am the officer who has been assigned to handle your Customs
hold (FedEx 805863853381).  In order for us to expedite the
examination of this shipment, please provide the following:

-End user information (use the attached BIS-711 to fill out).

-Invoice for samples.

-As well as every other document pertaining to this shipment.

Please be advised of the importance of accurately filling out export
paperwork, as misdeclaring goods and/or failing to file accurate
export paperwork (Shipper□s Export Declarations or Electronic
Export Information) is a federal offense, as is lying to a federal
officer.  You can find more information here:
https://www.law.cornell.edu/uscode/text/13/305  Also, because of
the sophisticated nature of these items, please be aware that some
components may be restricted for export from the United States and
may require a license from either the U.S. Department of Commerce
(DOC) or U.S. Department of State (DOS).  Please reference the
DOC website for any items that may have a □dual-use□
application: http://www.bis.doc.gov/index.php/licensing/commerce-
control-list-classification/commerce-control-list-ccl/17-
regulations/139-commerce-control-list-ccl Please reference the DOS
website for licensing procedures regarding defense articles:
http://pmddtc.state.gov/licensing/

Please comply with my request as soon as possible.  The sooner I
receive those documents, the sooner I can possibly release your
goods.


Please let me know if you have any questions.


Thank you,


Kevin M. Knipp

CBP Officer

Outbound Enforcement Officer

18

EXHIBIT 8



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

**OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE**



ICE

---

10/18/2016 14:08 EDT                                                                 Page 3 of 11

and export paperwork.  CHEN stated that she believed the ASSI shipments were going to China, and relayed an anecdote regarding one incident when she was working at Northern University, in approximately 2010, in which there was a package she was supposed to mail for a client who was not Maggie.  CHEN stated that she mistakenly sent that package to Maggie.  At that time, CHEN called Maggie and asked if she could return the package to CHEN, but Maggie responded that the package had already gone to China.  CHEN added that is why she believed that most of her packages eventually ended up in China.

When asked if she recalled Maggie ever warning her not to mention China, CHEN responded in the affirmative.  CHEN was then shown an e-mail dated August 13, 2014, in which Maggie (Maggie@star-ai.com) told CHEN (c.si.china@hotmail.com) in pertinent part:

"Please remember country please write Hong Kong, not China."

CHEN responded that she recalled the e-mail, but added that there was a story behind that e-mail.  CHEN elaborated that one time, she went to a FedEx branch office and filled out a shipping form with the address, city and country and zip code.  CHEN stated that she made a mistake and wrote Hong Kong as the city and China as the country.  CHEN stated that her understanding was that Hong Kong was part of China, and FedEx refused to return the package because there is not a city in China called Hong Kong.  CHEN noted that although it was a long time ago, Maggie reminded her of that in the e-mail because of that incident.

When asked where she believes Maggie resides, CHEN stated that she believes that Maggie lives in both Hong Kong and Shenzhen, China.  CHEN stated that she believed that Maggie lived in Hong Kong part-time because in one instance, Maggie asked CHEN to look at iPhones and purses in the United States, as Maggie thought it might be cheaper to purchase those items in the United States for family and friends.  CHEN stated that she went to the market and took pictures of those items, along with price tags, and sent that information to Maggie.  According to CHEN, Maggie responded that they were the same prices as in Hong Kong.  CHEN speculated that because Maggie responded as soon as CHEN sent the pictures, CHEN believed that Maggie immediately went to the market in Hong Kong to compare prices.

CHEN stated that Maggie provided CHEN with a range of prices to report on export paperwork for the value of the shipments, as opposed to a specific value.  SA Peterson asked CHEN why, in CHEN's opinion, Maggie provided a range as opposed to a specific price.  CHEN responded that there were many instances that the packing list included with the shipment did not have the value of the items listed, and there was no way for CHEN to figure out the value of the items.  CHEN added that ASSI was registered in Delaware, the primary reason of which was that if Maggie made a purchase from Hong Kong it would be very expensive, but if she used a U.S. company to purchase the items, it would be far less expensive.

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| OPERATION ANGEL FIRE | ████████ |  |

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# EXHIBIT 9

License Determination
E1024590
Date of Completion:
November 14, 2016



UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230

**Agency Reference Number:** 2016-11-1-ICE-03241

**Witness(es):** Technical: Carlos Monroy/(202) 482-3246

**Commodity Description:** 24-34 GHz Ka-band Low Noise Amplifier
**Manufacturer:** OMMIC
**Requested Start/End Dates:** July 01, 2015 - September 01, 2015
**Intermediate Countries:**
**Destination Country:** Hong Kong

### Determination Details
**Start Date:** July 01, 2015 **End Date:** September 01, 2015
**BIS License Required:** Yes
**ECCN:** 3A001.b.2.d
**Reason(s) for Control:** Anti-Terrorism, National Security, Regional Stability
**Policy Text:**
Based on the information provided with this request, the Bureau of Industry and Security (BIS) has determined that the OMMIC CGY2128UH/C1 Low Noise Amplifier, is subject to the Export Administration Regulations (EAR) (15 C.F.R. Part 730 et seq.) and is classified under Export Control Classification Number (ECCN) 3A001.b.2.d, controlled for national security (NS1), Regional Stability(RS1), and anti-terrorism (AT1) reasons. From July 1, 2015, to September 1, 2015, a BIS license was required under the EAR for the export or re-export to Hong Kong and for the export or re-export to the PRC of items classified under 3A001.b.2.d. During the specified time period, there were no list-based license exceptions available for the export or re-export of these items to Hong Kong and for the export or re-export of these items to the PRC .

The licensing policy for exports to China (PRC) described in Part 742.4(b)(7) of the Export Administration Regulations (EAR) is to approve applications to export, reexport or transfer items to civil end-uses, except those that would make a direct and significant contribution to the PRC#s military capabilities such as, but not limited to, the major weapons systems described in Supplement No. 7 to Part 742 of the EAR.

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I, Donna E. Mosier, declare:

3

That I am a citizen of the United States and a resident of or

4

employed in Los Angeles County, California; that my business address

5

is the Office of United States Attorney, 312 North Spring Street,

6

Los Angeles, California 90012; that I am over the age of 18; and

7

that I am not a party to the above-titled action;

8

That I am employed by the United States Attorney for the

9

Central District of California, who is a member of the Bar of the

10

United States District Court for the Central District of California,

11

at whose direction the service by mail described in this Certificate

12

was made; that on September 24, 2018, I deposited in the United

13

States mail at the United States Courthouse in the above-titled

14

action, in an envelope bearing the requisite postage, a copy of:

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

15

service was:

16

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

17

18

☐ By hand delivery, addressed as follows:

☒ By e-mail, as follows:

19

☐ By messenger, as follows:

☐ By Federal Express, as follows:

20

Leslie De La Torre, USPO
Leslie_DeLaTorre@cacp.uscourts.gov

21

22

at her last known address, at which place there is a delivery

23

service by United States mail.

24

This Certificate is executed on September 24, 2018, at Los

25

Angeles, California.  I certify under penalty of perjury that the

26

foregoing is true and correct.

*/s/ Donna E. Mosier*

27

Donna E. Mosier, Legal Assistant

28